258 P.2d 711

**APODACA v. ALLISON & HANEY et al.**

**No. 5525.**

Supreme Court of New Mexico.

June 16, 1953.

Simms, Modrall, Seymour & Simms and James E. Sperling, Albuquerque, for appellants.

Fred L. Nohl and Joseph L. Smith, Albuquerque, for appellee.

LUJAN, Justice.

This is an action for additional compensation for the alleged failure of the defendants, Allison & Haney, to supply reasonable saftey devices in general use in the work in which they were engaged for the protection of their employees at the time of the injury suffered by decedent causing his death. The verdict was in favor of the plaintiff, and from the judgment entered thereon, the defendants have appealed.

For some five weeks prior to the happening of the accident on 16th day of August, 1950, resulting in decedent's death, the defendants, Allison & Haney, had been engaged in laying a sewer line in the streets of the City of Albuquerque. The line began at the sewage disposal plant on South Second Street and had been completed up to East Central Avenue and North Edith, a distance of 7000 feet, or 1¼ mile. In the immediate neighborhood of where the work was being done the ground is sandy. The Southern Union Gas Company's main and service gas lines which are laid 3 feet below the surface, run 7 feet directly over where the sewer line was installed. The sewer trench was dug, and the pipe was so laid that the bottom of it was about 11 feet below the surface of the ground. The pipe was about 2¼ feet in diameter and was made in joints of reinforced concrete. Seven thousand feet of pipe had been laid down and covered with dirt and paved. At this point four joints of pipe were connected with the completed 7000 feet of sewer line, dirt had been thrown back into the trench and the ground tamped up to 2 feet from the surface, but the inside joints had not been caulked.

On the morning of August 16, 1950, the plaintiff's husband, an employee of Allison & Haney, a copartnership, took an electric lantern, a bucket of mortar and a pair of rubber gloves and entered the sewer pipe to caulk the joints. He had worked about two hours and was inside of the pipe at a point approximately 16 feet from the mouth of

the open trench where he entered when an explosion occurred and he was injured, from which injuries he later died.

In her complaint she alleged that she was entitled to fifty percent. (50%) additional compensation because the death of her husband resulted from the failure of the employers, Allison & Haney, to provide the safety devices required by law and the negligence of said employers in failing to supply reasonable safety devices in general use for the use or protection of workmen. In its answer the defendants denied the allegations of the complaint.

The plaintiff introduced evidence showing that the deceased entered the sewer pipe as above stated; that an explosion occurred; that he was injured and that as a result thereof died. She also introduced evidence to the effect that about two weeks prior to the explosion gas leaks were discovered in the gas service lines close to the sewer trench and that the same had been repaired; that two or three gas leaks had been repaired along the line as the work progressed; that there is always a chance of service lines leaking; that leakages in service lines often occur from poor connections, couplings or rotted pipes; that in a pipe line such as the one in question, 7000 feet long, the air would be low in oxygen content because of little circulation with an opening of 30 inches at one end; that there were two explosions, one followed immedi-

ately another; that a few hours after the explosion a test was made and explosive gas was found inside the sewer pipe; that an air compressor was installed and used to free the entire length of the sewer line from gas; that after using said compressor for two hours gas was still registering in the pipe for a distance of three or four blocks from the end of the pipe; that the compressor was then used for another six hours or until the entire sewer line had been freed from gas; that the explosion was of such force that it blew off the lid from a manhole approximately 500 feet away from where the deceased was killed; that the Southern Union Gas Company's main gas pipes contained natural gas and extended along north and south Edith Street, and that from the main gas line service pipes are led over and across the sewer line to its customers; that the service pipes were disconnected as encountered to allow the power shovel of defendants, Allison & Haney, to dig the trench for laying the sewer pipes; that they were then reconnected, the gas turned on and the trench refilled with dirt and tamped down.

The proof further showed that there are gas indicators manufactured and available for use in underground work; that they are in use by some employers engaged in underground work in Albuquerque; that these indicators are used where the presence of inflammable and explosive gases is known or suspected in any enclosed area because

it is not good practice to depend on sense of smell; that they will detect any kind of gas whether it can be smelled or not; that there are also air compressors manufactured and available for blowing out gases which have accumulated in an enclosed area; that if a gas indicator had been used here it would have shown the presence of gas in dangerous volume in the sewer pipe and the use of an air compressor would have eliminated such gas; that employers engaged in work of the kind decedent was doing at time of his death, underground work, use both gas indicators and air compressors where the presence of gas is suspected.

At the end of plaintiff's case the defendants moved for a directed verdict. The court denied the motion and thereupon the defendants proceeded to put on their case.

They tendered testimony of the custom and usage followed by other contractors in the construction of "open" sewer lines. They also presented testimony tending to question the existence in general use by employers engaged in underground work of any safety device of the kind and nature here shown in evidence calculated to disclose and eliminate dangerous, explosive gases. As indicated by what has been said, however, much of their testimony related to construction of "open sewers" or excavation work of that nature. That the trial judge, himself, sensed the decedent was engaged in "underground" work, is demonstrated by the fact that, upon objection, he compelled the reframing by defense counsel of hypothetical questions to accord with the demonstrated fact that this was "underground" and not "open sewer" construction, especially in so far as it applied to the work being done by plaintiff's decedent.

██ Defendants contend that the court erred in overruling their motion, interposed at the close of plaintiff's case in chief to dismiss the complaint upon the ground that the claimant had failed to prove that the injury of claimant's decedent was proximately caused by employers' negligence in failing to provide safety devices in general use in the industry in which the employer and employee were engaged. When that motion was overruled, defendant waived its objection to the action of the court, by afterwards introducing evidence in their behalf. They did not renew their motion at the close of the entire case, consequently we will not review this assignment of error. State v. Analla, 34 N.M. 22, 276 P. 291; State v. Stewart, 34 N.M. 65, 277 P. 22; Salazar v. Garde, 35 N.M. 353, 298 P. 661; Crocker v. Johnston, 43 N.M. 469, 95 P.2d 214.

██ It is next contended, in substance, that there was no substantial evidence to support a verdict in favor of the claimant, due to absence in the record of proof that

there were any reasonable safety devices in general use in the construction work in which the employer and the employee were engaged of a nature calculated to prevent an injury of the kind causing decedent's death. It is to be borne in mind that all evidence most favorable to the plaintiff must be accepted as true, and that the plaintiff must be given the benefit of all reasonable inferences arising from such evidence, and all evidence unfavorable to plaintiff must be disregarded. This principle of law, applicable in testing here substantial character of evidence supporting a challenged finding, is so firmly established that citations seem unnecessary in support thereof. Nevertheless, see, City of Roswell v. Hall, 45 N.M. 116, 112 P.2d 505; Dickerson v. Montoya, 44 N.M. 207, 100 P.2d 904; Williams v. Engler, 46 N.M. 454, 131 P.2d 267; Sundt v. Tobin Quarries, 50 N.M. 254, 175 P.2d 684, 169 A.L.R. 586.

■ The act here involved was passed to compel employers to supply reasonable safety devices in general use for the protection of the workmen where safety devices are not specified by law. Only by observing it may employers avoid liability under it for compensable injuries to their employees. It is negligence to fail to do so if the facts render the act applicable. We said in Janney v. Fullroe, 47 N.M. 423, 437, 144 P.2d 145, 154, touching rationale of the "general use" proviso of the act, and speaking through Chief Justice Sadler, the following, to-wit:

"When it comes to the requirement for reasonable safety devices in general use, however, we find a different situation. The determination of what is a reasonable safety device in general use necessarily rests in the judgment and discretion of the employer. Much will depend on how he exercises that discretion. If he permits thoughts of cost and expense to outweigh considerations of safety, the statute is circumvented and the personal security of his employees is imperiled. The legislative mind apparently felt that it would furnish the employer an incentive for resolving close questions of reasonableness and general use in favor of the workman and against himself * *."

■ The evidence is ample to entitle the jury to find that there was in common use, known to the defendants, or which in the exercise of ordinary care should have been known to them, safety devices for detecting and eliminating gases which might have accumulated in their sewer conduit in dangerous quantities, without depending solely on the sense of smell. In consideration of the evidence before the jury in the light of applicable law, we conclude that the trial court did not err in submitting the controversial issues of fact to the jury and that

the verdict of the jury on these issues is sustained by competent evidence.

But it has been suggested that in reaching the conclusions we do, we have converted this into a cause of action in negligence rather than confining it to a recovery sought under the safety statute. This suggestion is provoked, no doubt, because at the trial much was said and considerable evidence brought out touching the hazards and dangers to be apprehended from working with, or in proximity to, explosive gases. It is difficult, at best, to discuss explosive gases without invading the field of negligence where the case involves men working in and about it.

■ Actually, the safety statute itself makes the case one of negligence—negligent failure of the employer to supply reasonable safety devices "in general use" for the protection of the workman. Protection from what? From the dangers to which his labor exposes him, of course. They are not factors to be considered, to be sure, as a ground of recovery. But, obviously, they are pertinent on the issue of whether there was a reasonable safety device in general use. The child must crawl before it walks! And how can it be better shown there is a reasonable safety device in general use than by first demonstrating there is some hazard or danger to workmen engaged in the given industry whose constant presence in past experience demonstrated the need for

it. An attorney trying his lawsuit can not prove his case all at once. As the child crawls, then walks, so must counsel step by step put in the evidence which when completed or connected up leads to the ultimate, vital and decisive fact.

■ While the testimony of various witnesses is conflicting, at times, and inconsistencies may be found in testimony of the same witnesses, nevertheless, we do not feel it can fairly be said false testimony was given by any of the witnesses. Such conflicts and inconsistencies as appear are due, either to misunderstanding or honest confusion on the part of the witness. But it was for the jury to characterize inconsistency in the testimony of a given witness, where it could and then say what are the facts. Bubany v. New York Life Ins. Co., 39 N.M. 560, 51 P.2d 864; Wallach v. Paddock, 49 N.M. 317, 163 P.2d 632; Koprian v. Mennecke, 53 N.M. 176, 204 P.2d 440; McCool v. Ward, 53 N.M. 467, 211 P.2d 131.

But there was no confusion or conflict on one vital fact, namely, that there was and is a reasonable safety device, the timely use of which would have prevented this accident and have saved this man's life. Its general use was issuable before the jury, to be sure, but as we have already held and as the testimony adduced at the trial fairly establishes, a portion of which we will hereinafter quote, that issue was found in

favor of the claimant. P. W. Martin, the General Superintendent of Southern Union Gas Company, among other things, testified:

"Q. Is this device something used exclusively by the Southern Union Gas Company or is it available generally in the industry? A. It is available—it is used by a great many companies.

"Q. You stated that you have worked for a number of companies, did they all use a device similar to this? A. Yes, sir.

"Q. For the purpose of detecting inflammable or combustible gases? A. Yes, sir.

"Q. When you check a given enclosed area or areas and find the presence of inflammable or combustible gas, what is the usual procedure to take care of the situation to make it safe to work in? A. We immediately attempt to find the source, and we repair it.

"Q. After you have found the source and turned it off, what do you do about the enclosed gases that have escaped? A. That depends on the conditions. Gas is much lighter than air and will vent itself in a few minutes if it is natural gas.

"Q. It will vent itself up to where there are no further openings? In this room, it would vent itself up to the ceiling, up to the top of the windows? A. That is right.

"Q. How would you dispose of that? A. That would depend on the situation. I have seen the fire department cut holes in the roof to get rid of it.

"Q. Could you use a blower to get rid of it? A. Yes.

"Q. Is the use of a blower restricted to the Southern Union Gas Company? A. No, there are types that are generally available.

"Q. Are they generally in use throughout the industry where gas may accumulate? A. I would say gas companies have them. I don't know about other concerns.

"Q. They are standard manufactured products and can be bought by anyone and used if they want that type of safety appliance? A. That is right.

"Mr. Nohl: We offer in evidence Plaintiff's Exhibit 2, Your Honor.

"Mr. Roehl: We have no objection.
"The Court: It will be admitted.

"Q. Mr. Martin, are combustible gas indicators such as Plaintiff's Exhibit 2 or devices similar to it performing the same functions generally furnished in New Mexico or elsewhere by the employer for the use and protection of workmen where there is known to be inflammable gas, where there possibly could be inflammable or dangerous gas present? A. If you suspected its presence, you would furnish one, yes.

"Q. If you ever suspect the dangerous

gas is present you would furnish one to your employees? A. Yes, sir.

"Q. If you know, Mr. Martin, are these devices generally furnished in the industry to employees where they are working in underground work where it is thought or it is possible there is dangerous or inflammable gases present? A. I am not familiar with underground work other than trenching.

"Q. Trenching is open. I am speaking of enclosed areas. A. I couldn't answer that. I don't know.

"Q. *You have stated that the practice of the Southern Union Gas Company is to furnish to their employees this device where they are working underground in the presence of natural gas or where there might be gas present?* A. *Yes, sir.* (Emphasis ours.)

\*    \*    \*    \*    \*    \*

"Q. Did they ever in any manner indicate to you that there was any gas in the area that was leaking that might be in the atmosphere? A. They repaired two or three leaks along the line, yes.

"Q. Did they ever ask you at any time to bring out the indicator to test prior to this explosion? A. Not that I recall.

"Q. Now, Mr. Nohl has asked you in regard to this indicator, whether the same is available to contractors generally? A. They can be purchased. They are not read-ily available as the instrument is hard to get.

"Q. Do you know whether an indicator such as this nature is used by every contractor laying sewer lines? A. No, sir.

"Q. Do you know of any who uses an indicator such as this?

"Mr. Nohl: Object to the question. The statute under which this action is brought concerns safety devices in general use; it doesn't restrict it to the particular industry of sewer line contractors. The question is generally available and in general use, and he testified he doesn't know. He just testified that the indicator is available.

"The Court: Overruled.

"Q. In this area? A. Yes, sir.

"Q. *I am asking whether you know of any sewer contractor that uses one of these?* (Emphasis ours.) A. Yes, I do know.

"Q. In cases where there is no suspicion of gas being present is the indicator used by your company? A. No, sir.

"Q. In cases where no gas is suspected, to your knowledge is the indicator used by other contractors generally? A. I don't see why they would."

At the trial, there occurred considerable colloquy between court and counsel, at different times, as to just what kind of work the employer and the decedent employee were engaged in. Illustrative of this is the

objection of one of defense counsel to testimony of a witness, as follows:

"Mr. Sperling: Unless he has personal knowledge of this, his understanding of what is done in Texas or his understanding from the literature put out by the company as to what the general use is, naturally, that would be what the company wants it to be in general use. *Unless the testimony is limited to use in New Mexico in the construction of a new open sewer lines, this testimony is all immaterial, and we are making a very serious objection.*" (Emphasis ours.)

In other words, the defendants here would limit application of the safety device statute to contractor's doing "open sewer" work. Actually, in the employer's relation to this decedent, they and he were not engaged in "open sewer" construction and the trial court correctly so held. Nor was it necessary that the work under way be done by a "contractor" at all. If the city itself had been doing this job by or through its own work force, compare Snider v. Town of Silver City, 56 N.M. 603, 247 P.2d 178, and the death of decedent had occurred under similar circumstances would the fact that it was not a "contractor" engaged in underground construction, where the same conditions and hazards were encountered, as here, render impertinent the inquiry as to it whether there were reasonable safety devices in general use, the employment of

which would have saved decedent's life? We think not.

The fact that there were but few engaged in the construction of sewer lines in streets carrying gas mains along which service lines were constantly encountered that had to be disconnected and reinstalled, thus creating the hazard here experienced, would not preclude proof that there was a reasonable safety device employed by enough of the few so engaged to establish a general use. This case is not unlike that of Wright v. Schultz, 55 N.M. 261, 231 P.2d 937, in the respect that there were few buildings equipped with elevators in Albuquerque at time of plaintiff's injury, yet few as there were we held the evidence sufficed to show general usage of the safety device involved.

Finally defendants claim that the court erred in permitting the witness Ernest L. Martin to testify as to the use of certain safety devices in particular industries for the reason that such testimony was incompetent, irrelevant and immaterial. Regardless of the fact, however, we cannot believe such testimony, even if erroneously admitted, could have affected the case so as to constitute reversible error. Similar testimony was given by other witnesses without objection. Furthermore, some testimony of this witness pertinent to the vital issue came in without objection.

Finding no error, the judgment is affirmed and the cause remanded with direction to the trial court to enter proper judgment against the defendants and the sureties on their supersedeas bond. The appellee is allowed $750 attorneys' fee for the prosecution of her case in this court. Costs are adjudged against the defendants.

It is so ordered.

SADLER, C. J., and COMPTON, J., concur.

McGHEE, Justice (dissenting).

I am unable to agree with the majority that there is sufficient evidence in the record to support the finding a gas detector machine was in general use in the sewer construction or pipe line industry. Perhaps we should first determine the burden and quantum of proof which one asserting the right to enforce the 50% penalty for failure to furnish a safety device in general use must meet in order to sustain a judgment in his behalf

The applicable part of the safety device statute, sec. 57–907, 1941 Comp., reads:

"*  *  *  In case an injury to, or death of, a workman results from the failure of the employer to provide the safety devices required by law, or in any *industry* in which safety devices are not provided by statute, if an injury to, or death of, a workman results from the negligence of the employer in failing to supply reasonable safety devices in general use for the use or protection of the workman, then the compensation otherwise payable under this act *  *  *  shall be increased by fifty per centum (50%). *  *  *"  (Emphasis mine.)

The industry in which the employer was engaged was the sewer construction industry. Undoubtedly the explosion and resulting death of the workman was caused by the ignition of gas which had entered the sewer line inside of which the workman was engaged in caulking the joints. It was his work inside of the pipe which placed him where he was killed by the explosion.

The statute quoted above specifies a safety device "*in general use*" in the industry, absent a statutory safety device, as is the case here.

This safety device statute is new in the field of workmen's compensation acts. New Mexico seems to be the pioneer state in the field, and decisions from other states are of little help.

In Jones v. International Minerals & Chemical Corp., 1949, 53 N.M. 127, 202 P. 2d 1080, we had the claim by the claimant that the use of a certain type of improved electrical switch by one potash mine and refinery would have prevented the starting of the machinery and the resulting death of the workman. It is true we were there

326

dealing with a statutory safety device, but the claim was made such improved switch was in general use in the potash industry. We said aside from the the statute the use by one company where three potash companies were operating in the Carlsbad potash basin did not constitute general use.

In Flippo v. Martin, 1948, 52 N.M. 402, 200 P.2d 366, the penalty was claimed because of the failure of the employer to furnish clamps for the cable used in drilling a water well instead of a rope which broke, as a result of which the workman's body became entangled in the cable, causing his injury. The claim was made that such a clamp would have prevented the injury, and that it was a reasonable safety device in general use in the water-well drilling industry in Eddy County. The jury found in favor of the claimant on such issue, and we held the evidence was sufficient to support the finding. It is a matter of common knowledge there were a great many oil wells drilled in the vicinity of the water well, but the case turned on general use of a reasonable safety device in the water-well drilling industry, and the evidence was sufficient to prove such device was furnished by a majority of the drillers of water wells in Eddy County.

In Wright v. Schultz, 1951, 55 N.M. 261, 231 P.2d 937, the workman claimed his fall down an elevator shaft was caused by the failure of the employer to barricade the door to the shaft or to floor the shaft while he was sanding the inside of the elevator door preparatory to painting it. The claim was made that such barricade and floor coverings were reasonable safety devices in general use in Albuquerque while workmen were engaged in and around such shafts. We held that although there were only a few buildings in Albuquerque equipped with elevators, the proof was sufficient to show such general use in the painting or construction industry while workmen were engaged in and around elevator shafts. As the author of the opinion I was concerned with whether the testimony showed such devices were used by a majority of the contractors, in such industries, and concluded that it did. I was concerned with the same point in the Flippo case, supra, and made the same decision.

What does general use mean? Webster's New International Dictionary, 2d Ed., p. 1043, defines "general" as follows:

"5. Pertaining to, * * * many, or the greatest number of, persons, cases, or occasions; prevalent; usual; extensive; * * *".

The only cases I find on the term "general use" in Words and Phrases are Brooklyn Church Soc., etc. v. Brooklyn F. K. Soc., Sup.1914, 152 N.Y.S. 41, 44, and our case of Jones v. International Minerals & Chemical Corp., supra. On "general usage" I find United States v. Stanolind

Crude Oil Purchasing Co., 10 Cir., 1940, 113 F.2d 194, 200, and Codd v. Westchester Fire Ins. Co., 1942, 14 Wash.2d 600, 128 P.2d 968.

In the Brooklyn Church case use of buildings was granted for a kindergarten school until such time as kindergarten schools were generally adopted as a part of the school system of the city. It was held that equipping 75% of the school buildings was a general adoption.

In United States v. Stanolind Crude Oil Purchasing Co., supra, the court, speaking through Judge Phillips, said, 113 F.2d at page 200:

"A usage is a mode of dealing generally observed in a particular trade. A usage universally recognized and observed by those engaged in a particular trade throughout a state is a general usage. While it must be generally recognized by those engaged in the trade, it need not be observed in every individual transaction in order to be general."

The Washington case involved the admission of evidence and cited and followed the rule of the Stanolind case.

It seems to me the terms "general use" and "general usage" mean the same thing.

I believe one trying to enforce the penalty clause of our Workmen's Compensation Act, supra, for a nonstatutory safety device has the burden of establishing by a preponderance of the evidence, as this term is defined in New Mexico law, that the injury was caused by failure of the employer to furnish a reasonable safety device furnished by a majority of those engaged in the industry in the section in which the work is prosecuted.

The proof in support of the general use of the gas detector was that it was used by the gas company when it was working in and around mains where gas was thought or known to be present, and the superintendent of the gas company knew of one sewer contractor who had such devices. It was further shown they are used by the telephone company when manholes in its established conduits are opened on city streets for work at the manhole. There was no proof whatsoever as to the number of sewer contractors using the device on closed or open trench work, except one witness who knew of one such contractor, or respecting usage by pipe line contractors or operators in Albuquerque or anywhere else. In fact, a number of local contractors engaged in such work testified they had never used such devices or known of their use in New Mexico; that if gas was detected or smelled they called the gas company which brought the devices to the job and cleaned up the situation.

We think the following testimony of the witness Martin as to the availability of

these gas detectors is very significant on the issue of their general use. We quote from his testimony taken from the majority opinion:

"Q. Now, Mr. Nohl has asked you in regard to this indicator, whether the same is available to contractors generally? A. They can be purchased. They are not readily available as the instrument is hard to get."

I venture the suggestion that articles in general use are not hard to get.

Without proof of the number of contractors or municipalities engaged in such work or industry, in the state or in and around Albuquerque, use of the machine by the gas company, one sewer contractor and the telephone company when opening manholes to conduits long closed is held to be sufficient evidence of general use in the industry, aided by the statement doubts are resolved in favor of the judgment, and this in the face of what I deem to be overwhelming testimony that such a machine was not in general use in New Mexico.

I agree the evidence would support a verdict for negligence in failing to supply the gas detector absent our Workmen's Compensation Act, Sec. 57–901 et seq., 1941 Comp., which provides the exclusive remedy, and it is my belief that because of such negligence the judgment under the penalty clause of the Workmen's Compensation Act has been affirmed.

The net effect of the majority opinion is that some use of a safety device constitutes general use—common understanding, the dictionaries and court decisions to the contrary notwithstanding. The platitudes in the majority opinion about the baby learning to walk and the lawyer proving his case step by step are not in my opinion sufficient substitutes for the proof that should be in the record to justify an affirmance.

I dissent.

WALDO H. ROGERS, D. J., concurs.