492 P.2d 1265

INTERNATIONAL MINERALS & CHEMICAL CORPORATION (IMC), Appellant,

v.

PROPERTY APPRAISAL DEPARTMENT, State of New Mexico, Appellee.

No. 670.

Court of Appeals of New Mexico.

Dec. 3, 1971.

Rehearing Denied Dec. 27, 1971.

Certiorari Denied Jan. 18, 1972.

Clarence E. Hinkle, Hinkle, Bondurant, Cox & Eaton, Roswell, for appellant.

David L. Norvell, Atty. Gen., Anne K. Bingaman, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

WOOD, Chief Judge.

This appeal concerns the valuation for ad valorem tax purposes of a portion of the potash products of IMC (International Minerals & Chemical Corporation). The dispute as to the valuation arose because of a formula used in arriving at the valuation. The specific issues are: (1) was the production involved subject to valuation for tax purposes under § 72–6–7.1, N.M. S.A. 1953 (Repl.Vol. 10, pt. 2, Supp.1971); (2) was the formula a method in general use under § 72–25–5, N.M.S.A.1953 (Repl. Vol. 10, pt. 2, Supp.1971); (3) was the formula a regulation under § 72–25–6, N.M. S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1971); (4) was use of the formula prohibited be-

404

cause its use was a change in existing procedure; and (5) was the formula arbitrary?

The potash products involved are sylvanite, also known as muriate, and langbeinite, also known as sulphate of potash magnesium. The processing of these items includes a sorting by size or grades. One of the results of this sorting is material called "fines." The "fines" differ in two ways from the products that IMC sells on the market. They are a smaller particle size and they have a slightly lower potassium oxide content. IMC uses the "fines" as feed material in its postassium sulphate plant.

Section 72–6–7.1, supra, required the state tax commission to value potash mineral property. However, § 72–25–3, N.M.S.A. 1953 (Repl.Vol. 10, pt. 2, Supp.1971) transferred this duty to the property appraisal department. IMC protested the department's assessed value of the "fines." The property appeal board, after a hearing, denied the protest. IMC appeals the decision of the property appeal board. See §§ 72–25–10, 72–25–18 and 72–25–19, N.M. S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1971).

*Was the production involved subject to valuation for tax purposes?*

Section 72–6–7.1(B), supra, provides that production from potash mineral property is to be valued ". . . at fifty per cent [50%] of market value of the output of the property for the prior year. . . ." The tax year involved is 1970. The output involved is the "fines" for 1969. The issue under this point concerns "market value" for tax purposes.

It is undisputed that the "fines" have no commercial market; further processing is required. That processing occurs in IMC's potassium sulphate plant. The valuation point involved here occurs prior to the processing; it occurs while the material exists as "fines." Since there is no commercial market at this point, IMC infers that the fines may not be taxable because the valuation for tax purposes under § 72–6–7.1, supra, is based on "market value."

 We treat the portion of IMC which produces the "fines" as the seller and IMC's potassium sulphate plant as the buyer. As between this fictional seller and buyer there is an exchange value. The exchange value is the "market value" in this situation. Kaiser Steel Corporation v. Property Appraisal Department, (Ct.App.), 490 P.2d 968, decided September 3, 1971. The "fines" were to be valued for tax purposes under § 72–6–7.1, supra.

*Was the formula a method in general use?*

Section 72–25–5, supra, provides in part: "When not otherwise determined by law, and without regard to ownership, the taxable value of property shall be determined by methods in general use. . . ." The starting point for determining taxable value is market value. See §§ 72–6–7.1, supra, and 72–25–2, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1971). The property appraisal department determined the market value of the "fines" for tax purposes by using a formula. IMC claims the formula was not a method in general use.

The details of the formula are not involved in this point; the issue is whether the formula was a method of valuation in general use. Findings of the property appeal board, supported by substantial evidence, are: Both IMC and Duval Corporation, another potash company, protested their assessments for the 1969 tax year. An agreement as to the assessments was reached with both companies. In the agreed assessments, the property appraisal department valued the "fines" by using the formula now disputed. For the 1970 tax year, Duval Corporation valued its "fines" by voluntarily using the formula in question. Duval Corporation also used this valuation as a "representative market price" of the "fines" in calculating its depletion allowance on its 1969 federal income tax.

 In addition to these findings, the Duval Corporation witness testified that its valuation pursuant to the formula was the "representative market price theory;" that use of this theory was acceptable prac-

tice; that there are other acceptable practices; that these different acceptable practices are those allowed under the Internal Revenue Code in connection with depletion allowances. We do not consider the "acceptable practices" under the federal Internal Revenue Code as a valuation method determined by New Mexico law to be used for our State tax. These acceptable practices under federal law are, however, evidence of a method in general use.

■ The foregoing evidence supports the conclusion of the property appeal board that the formula used in determining market value of the "fines" was a method in general use in determining taxable value.

*Was the formula a regulation?*

Section 72–25–6(A), supra, provides in part: "Unless a specific method for appraising property is provided by law, the department shall adopt regulations for appraising each kind of property in the state. . . ." Section 72–25–8, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.1971) sets forth a procedure for adopting regulations. It is undisputed that the property appraisal department did not follow the procedure of § 72–25–8, supra, before utilizing the questioned formula.

The issue is whether the formula is to be classified as a regulation. IMC contends the formula amounts to a regulation because it is a device for appraising its property; that is, a method used in determining the taxable value of its property. See § 72–25–2, supra.

■ The property appraisal department makes two responses. First, it asserts that no regulation is required if a specific method for appraising property is provided by law. The department asserts § 72–6–7.1, supra, provides a specific method. We do not consider this response because it does not appear that this theory was presented to the property appeal board. It may not change its theory of the case on appeal. Board of Education v. State Board of Education, 79 N.M. 332, 443 P.2d 502 (Ct.App.1968). Second, it contends

that "fines" do not amount to a "kind of property" within the meaning of § 72–25–6(A), supra.

■ We agree with IMC to this extent —the formula is a method used in appraising the "fines." It does not follow, however, that a "regulation," adopted pursuant to statutory procedure, was required before the formula could be used. Regulations are required for appraising "each kind of property." "Kind" is not defined in the statute. Accordingly, it is to be given its ordinary meaning. Albuquerque Nat. Bank v. Commissioner of Revenue, 82 N.M. 232, 478 P.2d 560 (Ct.App.1970).

■■ One of the definitions of "kind" as a noun in Webster's New Third International Dictionary (1966) is "category" or "class." Black's Law Dictionary (1951) indicates "kind" means a "generic class" and defines "in kind" as "in the same kind, class, or genus." We hold "kind of property" in § 72–25–6(A), supra, means general categories or generic classes of property. Compare Alabama By-Products Corporation v. Patterson, 258 F.2d 892 (5th Cir. 1958), cert. denied, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959); Fleming v. Commissioner of Internal Revenue, 241 F.2d 78 (5th Cir. 1957), rev'd, Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). The property appraisal department is not required, under § 72–25–6(A), supra, to adopt regulations for specific or individual types of property within general categories or generic classes of property.

■ In this case we are not concerned with regulations for appraising the general category of potash mineral property. See § 72–6–7.1(B), supra. The issue involves a particular type of potash mineral property; specifically, "fines." We hold that the property appraisal department's use of the formula in determining the market value of the "fines" was not a regulation within the meaning of § 72–25–6(A), supra.

*Was use of the formula prohibited because its use was a change in existing procedure?*

Section 72–25–6(H), supra, states: "All existing orders, rulings, regulations which have been filed with the state records center, and existing procedures of the state tax commission shall be continued in full force and effect until revoked, superseded or amended by the department; Provided however, that no public hearing shall be required on the repeal of regulations in effect prior to the date of this act."

The issue under this point concerns "existing procedures of the state tax commission." The authority, powers and duties of the state tax commission were transferred to the property appraisal department effective February 26, 1970. See § 72–25–3, supra, and Laws 1970, ch. 31, § 23. IMC contends that the existing procedure of the state tax commission on that date was to value the "fines" at $17.65 per K$_2$O ton. IMC asserts this valuation must be used and not the valuation derived from the formula.

The evidence is to the effect that the $17.65 per K$_2$O ton valuation for the "fines" is an arbitrary figure. Even though arbitrary, nevertheless it was the valuation used by the state tax commission through the 1968 tax year. In addition, there is evidence that the state tax commission was using the $17.65 per K$_2$O ton valuation in connection with the 1969 tax year. We will assume that this valuation was an existing procedure of the state tax commission. At the time the property appraisal department succeeded the state tax commission (February 26, 1970), the valuation for the 1969 tax year was under protest. The compromise settlement for the 1969 taxes was reached later in 1970. This settlement did not use the $17.65 per K$_2$O ton valuation; rather, the "fines" were valued according to the formula. The dates involved show the formula was employed by the property ap-

praisal department and not by the state tax commission.

Thus, under the assumption that the $17.65 per K$_2$O ton valuation was an existing procedure, this valuation was the existing procedure under the state tax commission. The change to the formula occurred under the property appraisal department.

IMC seems to assert that the valuation procedure in existence on February 26, 1970 must be applied. The inference is that no change may be made in an existing procedure. Section 72–25–6(H), supra, is to the contrary. Existing procedures were continued but only until revoked, superseded or amended.

IMC also seems to contend that the $17.65 per K$_2$O ton procedure had not been revoked, superseded or amended. The property appeal board found, however, that the valuing procedure by the property appraisal department for the "fines" in the 1969 tax year was through use of the formula. This formula having superseded the $17.65 per K$_2$O ton valuation procedure for the 1969 tax year, the $17.65 per K$_2$O ton valuation was not an existing procedure for the 1970 tax year.

Although the property appraisal department used the formula in valuing the "fines" in the compromise settlement for the 1969 tax year, IMC asserts it did not agree to the formula. It contends it only agreed to the overall settlement figure and argues that ". . . it would not be proper to hold that Appellant [IMC] had in fact agreed to the assessment of the feed material [the fines] on the basis of the formula used. . . ." This argument mistakes the finding of the property appeal board. It did not find that IMC agreed to use of the formula. It found that IMC agreed to an assessment in which the property appraisal department used the formula in valuing the "fines." The significance of this finding is that the $17.65 per K$_2$O ton valuation was not used in the 1969 tax settlement. It had been superseded.

We hold therefore that § 72–25–6(H), supra, did not require the property appraisal department to use the $17.65 per $K_2O$ ton valuation for the 1970 tax year.

*Was the formula arbitrary?*

■ One of the statutory grounds for setting aside the decision of the property appeal board is that the decision is arbitrary. Section 72–25–19(H) (6), supra. IMC contends the decision is arbitrary because the formula was used in determining the market value of the "fines." IMC's position is based on the fact that the sylvanite and langbeinite are graded by particle size. There are "coarse" particles and "standard" particles, and the resultant "fines." There is a difference in the market price for "coarse" and "standard" and no commercial market for the "fines." IMC asserts the formula does not consider the difference in price based on particle size and for this reason is arbitrary.

The formula used " . . . the average value per ton of the potash products sold in the market as either coarse or standard sized sylvanite and langbeinite, adjusted downward to account for the slightly lesser potassium oxide content. . . . " The result was considered to be the market value of the "fines," and was so found by the property appeal board. The issue here is not the adjustment for the lesser potassium oxide content. The issue is "average value" used in the formula when that average is based on "coarse" and "standard" sizes of the ore.

If something is "arbitrary" it is "not . . . according to reason or judgment." Webster's Third New International Dictionary, supra, Black's Law Dictionary, supra. Duval Corporation voluntarily used the formula in valuing the "fines" for its 1970 taxes. There is evidence that the "fines" are " . . . more closely associated with the standard grade than with the other two grades." The two grades, or particle sizes, other than "standard" and "fines" are "coarse" and "granular." There is evidence that " . . . the figures you used for the products sold

on the market, the figures of the $K_2O$ content does indicate ´ . . . ` . that you adjusted it for grade differential by taking an average, . . . . " We need go no further than this evidence that the average value of market sales indicates an adjustment for the differences in grades or sizes. With this evidence we cannot say, as a matter of law, that the formula was arbitrary.

The order of the property appeal board denying IMC's protest is affirmed.

It is so ordered.

HENDLEY, J., concurs.

SUTIN, Judge (dissenting).

I respectfully dissent.

It would not be helpful to the public, to industry, or to the legal profession to describe the methods used in the potash industry to produce "fines." The problems presented are: (1) Are the fines taxable? (2) If they are taxable, what is the proper method of determining the taxable value of these fines which have no commercial market value? These "fines" are processed and used by International Minerals & Chemical Corporation (IMC) as feed material to create a marketable product.

A conglomeration of statutes is involved. An Act Relating to State Tax Commission, § 72–6–1 to § 72–6–20, including § 72–6–7.1, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.), the Property Appraisal Department Act, § 72–25–1 to § 72–25–21, N.M.S.A.1953 (Repl. Vol. 10, pt. 2, Supp.), the Severance Tax Act, § 72–18–1 to § 72–18–4, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.).

One principle of statutory construction must be remembered and emphasized. It is stated in Field Enterprises Education Corporation v. Commissioner of Revenue, 82 N.M. 24, 474 P.2d 510 (Ct.App.1970), as follows:

Any doubtful meaning or intent of a tax statute must be resolved against the State and in favor of the taxpayer. We cannot extend the applicability of the

statute beyond a clear import of the language used therein.

(1) *Are the "Fines" Taxable?*

Sections 72–6–7.1 B and D read as follows:

> Potash mineral property shall be valued by the state tax commission as follows:
>
> \* \* \* \* \* \*
>
> B. The commission shall value the production from potash mineral property at fifty per cent [50%] of *market value of the output of the property for the prior year.* . . . The valuation of such production shall be in lieu of valuations of minerals in place or of any interest therein. [Emphasis added.]
>
> \* \* \* \* \* \*
>
> D. *The method of valuation herein prescribed is exclusive,* and no other valuation, assessment, or tax based thereon, shall be made, fixed or levied against potash mineral property for purposes of ad valorem taxation. Any other ad valorem tax on potash mineral property is void. [Emphasis added.]

Section 72–6–7.1, supra, is a "tax relief package." See 10 Natural Resources Journal 415, July 1970. We assume that "fines" are a portion of the "output" from production of potash mineral property.

The above statute says that "market value" is the exclusive method of valuation.

The majority opinion states that "The exchange value is the 'market value' in this situation." Kaiser Steel Corporation v. Property Appraisal Department, 490 P.2d 968 (Ct.App.), decided September 3, 1971. Kaiser said that exchange value:

> ". . . is determined by the demand for it in relation to the supply, and is proved, when possible, by actual sales. . . ." The steel mill's demand for the mine's supply shows an exchange value exists, but that demand does not determine what the value is. The fact that the steel mill took almost 96% of the mine run coal in 1968 and over 91% of the mine run coal in 1969, does not

show that it took, or would have taken, the coal as a willing buyer. . . .

If that rule were applied to IMC, this case would be reversed. The majority did not apply it.

There is no valid distinction between "market value" for sales purposes and market value for tax purposes. McCrory Stores Corp. v. City of Asbury Park, 89 N.J.Super. 234, 214 A.2d 526 (1965).

Section 72–25–5, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.) provides:

> *When not otherwise determined by law,* and without regard to ownership, *the taxable value of property shall be determined by methods in general use.* [Emphasis added.]

Note that this section seeks methods of valuation other than market value. Is this contrary to § 72–6–7.1(D), supra?

Section 72–25–6(A), N.M.S.A.1953 (Repl. Vol. 10, pt. 2, Supp.) provides:

> *Unless a specific method for appraising property is provided by law, the department shall adopt regulations for appraising each kind of property in the state.* Such regulations shall contain findings of fact upon which the method of appraisal is based and a detailed description of the method of appraisal of such property. [Emphasis added.]

Section 72–25–8(A) provides that "No regulation may be adopted, amended or repealed without a public hearing before the director."

From the foregoing statutes, how do we decide whether "fines" are taxable since they have no commercial market value and simply pass from one process of IMC to its plant?

There are three methods provided for determining taxable value: (1) by determining market value; (2) "by methods in general use"; and (3) by departmental regulations where no specific method is provided. These methods are in direct conflict, and they will be separately discussed and interpreted.

It requires a genius in the art of statutory construction to decide this issue.

Pursuant to § 72–6–4(1) (c), the Department shall determine the "actual value" of mineral property as defined in § 72–6–7 and § 72–6–7.1.

Under Article VIII, Section 1 of the State Constitution, the term "value" of tangible property means "reasonable cash market value" if there are sales of comparable property. If there are no comparable sales, and property has no such "market value," then other elements may be used which furnish proper criteria for consideration in determining value of real property. Hardin v. State Tax Commission, 78 N.M. 477, 432 P.2d 833 (1967).

Since "fines" have no market value, how do we determine the elements which may be considered in determining value? None are provided by statute. The majority opinion adopted the phrase "methods in general use."

What is meant by the words: "When not otherwise provided by law, the taxable value of property shall be determined by methods in general use"?

If we want to stretch its meaning, we can say when property has no market value, the Department can state the criteria to be furnished to determine taxable value by methods in general use. What is meant by the phrase "methods in general use"?

The phrase "in general use" is scarce in judicial decisions anywhere. In New Mexico, it is found in § 59–10–7(B), N.M. S.A.1953 (Repl.Vol. 9, pt. 1), the safety device statute of workmen's compensation. When we apply its meaning to "methods in general use" to determine taxable value, the phrase means "a method generally used in the particular potash industry that produces and uses 'fines'." See Dickerson v. Farmer's Electric Coop., Inc., 67 N.M. 23, 350 P.2d 1037 (1960).

In Jones v. International Minerals and Chemical Corporation, 53 N.M. 127, 202 P.2d 1080 (1949), the defendant is IMC in this tax case. Justice McGhee said:

. . . we do not think that the use by one employer when there are three engaged in the same industry establishes the "general use" required by the statute.

In Apodaca v. Allison & Haney, 57 N.M. 315, 258 P.2d 711 (1953), Justice McGhee, in a dissenting opinion, said in effect that the burden is on the Department to establish that the general use of a method is by a majority of those engaged in the industry.

The Department found that its assessment against IMC was based on a similar assessment made against Duval Corporation. This does not constitute a majority of the industry and is not a method in general use. The Supreme Court has said that the fact that another similar industry has used a different method of severing wires "does not thereby amount to proof that the wires were safety devices *in general use* under the statute." [Emphasis by the court.] Hicks v. Artesia Alfalfa Growers' Association, 66 N.M. 165, 344 P.2d 475 (1959).

The Department has no powers by statute to roam about in the area of methods "in general use" to determine the taxable value of "fines." It also adopted an appraisal method used under the United States Internal Revenue Code which method was not adopted in the Property Appraisal Department Act. It was set forth in a draft bill. See 10 Natural Resources Journal 415.

The "fines" were not taxable by the method used by the Department.

(2) *If "Fines" are Taxable, What is the Proper Method to Determine Market Value?*

Let us assume in passing that "fines" are taxable because elements can be established to determine "exchange value." What is the proper method to use? The second method is set forth in § 72–25–6(A), supra. There is no specific method provided by law for appraising property, for finding the criteria by which market value can be determined. Under this situation, the Department must adopt a regulation to establish the criteria. It failed to do so. It created

a formula of its own. It set forth the criteria by which it "arrived at a representative market value for the feed material." This formula is invalid. It had a duty to establish this criteria by a regulation after a public hearing.

The majority opinion has decided that "Regulations are required for appraising 'each kind of property'." and "fines" do not fall in this class.

In § 72–25–2(A), the word "appraise" is defined as follows:

"[A]ppraise" means *the method of determining the taxable value of property* for property taxation. [Emphasis added.]

Section *72–25–2(E)* says that "property" means "tangible property." The phrase "tangible property" is not defined. "Tangible property" is that which may be felt or touched, and is necessarily corporeal, although it may be either real or personal. H. D. & J. K. Crosswell, Inc. v. Jones, 52 F.2d 880, 883 (D.C.S.C.1931). See 73 C.J.S. Property § 5.

If we apply the above definitions to § 72–25–6(A), supra, it would read:

Unless a *specific* method for determining the taxable value of tangible property for taxation is provided by law, the department shall adopt regulations for determining the taxable value of tangible property for taxation of *each kind of tangible property* in the state. [Emphasis added.]

There is no *specific* method for determining taxable value.

The only remaining question is: Are "fines" a kind of tangible property?

"Fines" are a kind of tangible property. They are corporeal and can be felt and touched. They stand in a class of their own—a mineral class. "Each kind of tangible property" means each class whether called minerals, realty, goods or vegetables, etc. There is doubt between members of the court as to the meaning of "each kind of property." Therefore, this phrase should be construed against the state and in favor of IMC.

This court does not have the judicial power to emasculate the ordinary language of statutes in order to increase taxation on industry. The power to tax "fines" rests in the regulatory power of the Department. After it has first determined that "fines" have no market value, then it may appraise the taxable value by a formula adopted by way of regulation.

The statute does not define "market value." It is interesting to note that the 1971 New Mexico Legislature amended the Severance Tax Act by defining the "Gross Value of potash products." Section 72–18–2.1, N.M.S.A.1953 (Repl.Vol. 10, pt. 2, Supp.).

Since the Department failed to adopt a formula regulation, the fines are not taxable.

However, IMC contends that it should pay a tax on "fines" pursuant to a previous formula used by the State Tax Commission. Since it desires to pay a tax, I would conclude that this tax should be paid.